518 P.2d 1213

**Melvin H. WILSON, Personal Representative and Administrator of the Estate of Gregory Lee Wilson, Deceased, Plaintiff-Appellee,**

v.

**Kenneth Wayne WYLIE and Claude B. Wylie, Sr., Defendants-Appellants.**

No. 1066.

Court of Appeals of New Mexico.

Dec. 19, 1973.

Certiorari Denied Jan. 8, 1974.

Sutin, J., concurred in part, dissented in part and filed opinion.

Hernandez, J., concurred in result and filed opinion.

Joseph E. Roehl, James A. Parker, Modrall, Sperling, Roehl, Harris & Sisk, Knight & Sullivan, Herbert L. Cushing, Albuquerque, for defendants-appellants.

Charles G. Berry, Marchiondo & Berry, P.A., Albuquerque, for plaintiff-appellee.

## OPINION

LOPEZ, Judge.

Defendant Kenneth Wylie was the operator of an automobile which struck and killed plaintiff's decedent, a minor 7 years, 10 months old, who was riding a bicycle at the time. The trial court, sitting without a jury, awarded $57,000.00 for the present worth of the continued life of decedent and $10,000.00 for loss of society.

The defendants raise the following points for reversal of the judgment: (1) substantial evidence of proximate cause; (2) contributory negligence of decedent; (3) contributory negligence of decedent's parents, including the plaintiff herein; (4) excessiveness of the award of $57,000.00; (5) failure of the trial court to consider mitigating circumstances when making its award; and, (6) the award for loss of society.

We affirm in part and reverse in part.

(1) *Substantial evidence of proximate cause.*

■ The trial court found there was no evidence of brake failure prior to the accident. The defendants claim that the accident was caused by the unexpected failure of the brakes on the left side of the car to function properly at the time of the accident. They argue that the alleged defect caused the car to veer to the right resulting in the collision. Relying on skid marks showing that the automobile did veer slightly to the right, they conclude that the trier of fact is bound by physical evidence tending to support their theory. See Ortega v. Koury, 55 N.M. 142, 227 P.2d 941 (1951); Sanchez v. Public Service Company, 82 N.M. 752, 487 P.2d 180 (Ct.App. 1971), rev'd 83 N.M. 245, 490 P.2d 962 (1971); Bolen v. Rio Rancho Estates, Inc., 81 N.M. 307, 466 P.2d 873 (Ct.App.1970). These cases, as cited by defendants, involve situations where physical evidence directly contradicts oral testimony by a witness, rendering the oral recollection of the witness inherently improbable. This is not the case here. Rather, it is a case of conflicting inferences to be drawn from the undisputed evidence. One could infer brake failure from a skid mark gradually veering to the right. On the other hand one could infer that the car had a natural tendency to veer when skidding at high speeds. The trial court, in accepting the latter inference, was no doubt influenced by the following competent testimony: that the car tended to the right when braked at speeds above 60 miles per hour; that the car was being driven at 80 miles per hour immediately prior to the collision; that road tests performed subsequent to the accident revealed no defect in the automobile's braking mechanism; that an examination by the investigating officer immediately after the accident revealed a firm brake pedal, no brake fluid leakages and no brake defect; and that if the brakes on the left side had completely failed, as defendant claims, the car would have gone into a violent spin, instead of gradually veering to the right.

Even if this court was disposed to hold that a person driving 80 miles per hour in a residential area has not proximately caused a collision with a bicycle rider because the car failed to skid in a straight line, we still would accept the trial court's finding. From the evidence, the trial court could have inferred that defendant's brakes worked properly, considering the speed. This court will not review the facts, weigh them and consider inferences contrary to those reasonably drawn by the trial court. Jones v. Anderson, 81 N.M. 423, 467 P.2d 995 (1970); Kerr v. Schwartz, 82 N.M. 63, 475 P.2d 457 (1970).

(2) *Contributory negligence of decedent.*

Defendants advance a negligence per se argument in respect to decedent, claiming that he violated §§ 64–19–5(a), 64–18–8(a), 64–18–13(a)(2), 64–18–27(b), 64–18–29 and 64–18–44, N.M.S.A.1953 (2d Repl.Vol. 9, pt. 2), in addition to a claim that he failed to keep a proper lookout and exercise due care. The first three statutes require bicycles and other vehicles to proceed on the right side of the roadway. The other three relate to stop signs and rights-of-way.

The accident occurred at the intersection of Chelwood, a north-south street, and Menaul, an east-west street. The trial court found that decedent was proceeding in a southerly direction on Chelwood at the time of the accident. The Wylie vehicle was traveling in an easterly direction on Menaul. Even if we accept defendants' contention that decedent was operating his bicycle on the left side of Chelwood in violation of the statutes alluded to, we must uphold the trial court's finding of absence of contributory negligence.

In Martin v. Gomez, 69 N.M. 1, 363 P.2d 365 (1961), the defendant driver, at the time of the accident, was concededly in violation of § 64–18–8, N.M.S.A.1953 (2d Repl.Vol. 9, pt. 2), relied on here by defendant. The court in *Martin* stated:

"* * * It may be conceded that the defendant violated the provisions of the statute and the pertinent city ordinance; yet, this fact does not resolve the decisive question of causation.

"Granting that the defendant violated this statutory mandate, nevertheless, the evidence in this case relative to a causal connection between the statutory violation and the injury is not such as would have justified the trial court in ruling as a matter of law that the violation was the proximate cause of the injury. Consequently, the trial court was correct in leaving the issue of causation to the jury."

That the same rule applies in cases dealing with contributory negligence is clear from Fitzgerald v. Valdez, 77 N.M. 769, 427 P.2d 655 (1967). Here the evidence sustains an inference that the collision would not have been avoided even if the decedent had been obeying the statutory mandates relating to traffic flow. The violation of the statutes, if any, did not even cause or contribute to the accident in fact. Causation, at best, was a question for the trier of fact.

As to the statutes relating to stop signs, there was no proof whatsoever that decedent failed to stop as required before crossing Menaul. No witness saw him when he initially entered the intersection. Thus, defendants have failed to carry their burden. Realizing this, defendants argue that decedent, even if he did stop, failed to yield to the Wylie vehicle. The rule on the requirement to yield is stated in Brizal v. Vigil, 65 N.M. 267, 335 P.2d 1065 (1969), as follows:

"Consequently, * * * [the plaintiff] having entered the intersection at such interval of time and distance as to safely cross ahead of the vehicle approaching from the east, had its driver been exercising due care, the statute secured to him the prior use of the intersection."

If one who enters an intersection after heeding a stop sign is hit by a vehicle

greatly exceeding the speed limit, the issue of whether he is contributorily negligent is again for the trier of fact.

Finally, defendants allege a breach of the common law duties mentioned above. The only testimony not discussed previously, which defendants rely upon to support this contention, is that of one of the passengers in the Wylie vehicle. The witness testified that the decedent was looking straight ahead as he proceeded in a direction perpendicular to the movement of the automobile. We think that this testimony, even if believed, would not require a finding of contributory negligence as a matter of law. The direction in which the decedent was looking immediately prior to impact sheds little, if any, light on the crucial question of what his actions were when he entered the zone of danger. Since no one saw decedent until after he was in imminent danger, the question was, at best, for the trier of fact.

(3) *Contributory negligence of decedent's parents.*

Defendants allege that, " * * * both of decedent's parents were contributorily negligent in failing to instruct the decedent about crossing the intersection where the accident occurred, or in failing to restrict him from riding his bicycle in the intersection, and in failing to know of his whereabouts on the afternoon of the accident." We can only conclude that decedent had a right to be in the intersection at the time of the accident. See § 64–19–2, N.M.S.A.1953 (2d Repl. Vol. 9, pt. 2).

Defendants rely upon Foster v. United States, 183 F.Supp. 524 (D.C.N.M. 1959), aff'd. 280 F.2d 431 (10th Cir. 1960). That case is helpful here because it recognizes the rule that parents are not required to watch their children every minute of the day. However, the fact that the court in *Foster* held the parent contributorily negligent is of no avail to defendants here. The court in *Foster* was faced with a substantially different fact situation and was resolving the issue sitting as a trier of

fact. Here the defendants have the burden of proving contributory negligence as a matter of law.

We find the case of Reardon v. Wilbur, 441 Pa. 551, 272 A.2d 888 (1971), more persuasive. There a nine-year-old pedestrian was struck at a busy highway intersection. The court stated:

" * * * [T]he mere presence of a child of tender years on the street unaccompanied or unguarded is insufficient to establish parental negligence as a matter of law. Dattola v. Burt Brothers, Inc., 288 Pa. 134, 135 A. 736, supra.

"It is not negligence, as a matter of law, for parents to allow their nine-year-old children to go unattended outside the home * * *. Nor is it alleged that the father knowingly permitted her to cross the street at a place of danger. * * * "

Also, in Payne v. Kingsley, 59 Ill.App.2d 245, 207 N.E.2d 177 (1965), the court stated:

" * * * [the contributory negligence of parents] is ordinarily a question of fact for the jury to determine. * * * In making this determination, the jury must consider all of the attendant facts and circumstances, including the family relationship and station in life, the age and capacity of the minor and the nature of the danger to which the minor is exposed. * * * "

We feel that the trial judge had an opportunity to consider the factors alluded to in *Payne* and the testimony of the mother concerning her extensive warnings to decedent. Therefore, we feel there is ample basis to support the trial court's finding of no parental negligence.

(4) *Excessiveness of the award for the loss of the life of decedent to the estate.*

Defendants attack the award of $57,000.-00 for the worth of the continued life of decedent as excessive. They argue that the trial court either mistook the measure of damages or was motivated by passion or

**14**

sympathy. See Hall v. Stiles, 57 N.M. 281, 258 P.2d 386 (1953); Baca v. Baca, 81 N.M. 734, 472 P.2d 997 (Ct.App.1970).

In Lujan v. Gonzales, 84 N.M. 229, 501 P.2d 673 (Ct.App.1972), we described the measure of damages in a wrongful death action as follows:

> "Damages for wrongful death are recoverable ' * * * by proof of the worth of the life of the decedent * * *' and the measure of those damages is ' * * * the worth of life of decedent to the estate.' Stang II, supra. ' * * * Damages for the wrongful death may be recovered by proof of the present worth of life of decedent to the decedent's estate. * * *' Stang I, supra. Pecuniary injury to statutory beneficiaries, Stang I, supra, and net income during probable life, Varney v. Taylor, supra, are no more than evidentiary items admissible in establishing the present worth of life."

Plaintiff relies upon the testimony of Dr. Everett G. Dillman, an economist and statistician whose qualifications are unimpeachable and unchallenged, to support the trial court's Finding of Fact No. 29. The finding states that, " * *· * The present pecuniary value· of decedent's lost earning capacity is $57,000.00. * * *"

Dr. Dillman's testimony can be summarized as follows: The worklife expectancy of decedent was 43.4 years. Decedent would have probably married and remained married for 75 percent of his worklife expectancy, graduated from high school and completed at least two years of college. The average high school graduate earns $371,094.00 during his lifetime. Over decedent's worklife expectancy, this would amount to a probable annual income of $8,551.00 in 1968 dollars. Compounding productivity increases of 3.25 percent annually for ten years, decedent could be expected to be earning an average income of $13,929.00 per year, assuming he entered the labor force in ten years at age eighteen. At this income base, compounding at 5 percent per year for productivity increases

and projected annual inflation of 1.75 percent earnings of $2,037,159.00 could be expected over 43.4 years. The present, discounted value of decedent's probable net income after the necessary deductions for taxes and personal maintenance, assuming him to be an unmarried high school graduate, is $160,751.00; assuming the probabilities of marriage, $237,346.00; assuming four years of college and unmarried, $208,783.00; assuming four years of college and adding the probabilities of marriage, $308,263.00.

Defendants support their contention that the trial judge acted out of sympathy or mistake by arguing that she relied upon the allegedly "speculative," "impractical" and "foolish" testimony of Dr. Dillman. Unfortunately, defendants fail to analyze and cite no cases discussing the legal theories of speculative damages and inherently improbable testimony. However, we need not answer defendants' generalized contentions relating to the probative value of Dr. Dillman's testimony.

█ There is other, substantial evidence in the record, which, when combined with unchallenged portions of Dr. Dillman's testimony, supports challenged Finding No. 29. This evidence, in the form of decedent's father's income tax returns for the four years prior to trial, was introduced by defendants themselves. In fact, defendants commend this evidence to us as a far better basis than Dr. Dillman's testimony for determining the probable net income of decedent.

Using the father's income as a basis for predicting the performance of the son has found some support in the cases. See Williams v. United States, 435 F.2d 804 (1st Cir. 1970); Blisard v. Vargo, 185 F.Supp. 73 (E.D.Pa.1960), aff'd. 286 F.2d 169 (3d Cir. 1961); Zannelle v. Pettine, 51 R.I. 359, 155 A. 236 (1931). Dr. Dillman, under cross-examination by defendants' counsel, testified that the son is likely to attain the same "occupational situs" as his father.

Although defendants' counsel has not placed the income tax returns upon which

he relies in the appellate record, we believe that we can reconstruct their substance from the testimony of various witnesses. The 1968–1971 federal income tax returns for decedent's father indicate that his average annual adjusted gross income for that period was approximately $5,700.00. Dr. Dillman testified that the earnings of decedent's father during this period would be likely to reflect his expected average annual earnings throughout his worklife. Taking deductions for state and federal taxes from standard tables, which we judicially notice, and deducting the maximum social security tax as testified to by Dr. Dillman, the net average income drops to $4,083.00.

At this point we must depart slightly from the standard formula for computing probable net income set out in Varney v. Taylor, 77 N.M. 28, 419 P.2d 234 (1966), appeal after remand 79 N.M. 652, 448 P.2d 164 (1968). We feel that depreciation deductions taken by decedent's father, which have lowered the adjusted gross income for income tax purposes, should be returned to the income base for wrongful death purposes. Although New Mexico follows a net income approach, the court in Varney v. Taylor, supra, stated:

"* * * There are, no doubt, other amounts which should reasonably be deducted from gross earnings to arrive at that figure which would properly amount to the equivalent *of the loss of reasonably expected benefits* that would have resulted from the continued life of the decedent." [Emphasis added]

Decedent's father testified as follows:

"Q. Now, from * * * [gross income in 1970] you deducted six thousand dollars in depreciation?

"A. Yes, that's correct.

"Q. So actually that is money that actually didn't come out of your pocket, so to speak, at that time, is that right?

"A. Yes.

"Q. You had access to that money?

"A. Yes."

Since depreciation represents a "benefit" over and above adjusted gross income, we think the trial court would have been justified in considering it net income.

If an average of $6,000.00 per year depreciation for the three (of four) years decedent's father took such a deduction is added to average adjusted gross income and if a personal maintenance deduction of 42 percent (as testified to by Dr. Dillman) is taken, the average annual net income base becomes $4,978.00. The present worth of that figure over decedent's worklife expectancy of 43 years, following Dr. Dillman's method for computing present worth, is $59,112.00. That amount substantially supports the trial court's finding of $57,000.00 for the present value of decedent's lost earning capacity.

█ Defendants also point to the trial court's action in ignoring alleged mitigating circumstances and in ignoring the absence of pecuniary injury to the statutory beneficiaries in support of their contention that the trial judge acted out of sympathy or mistake. Mitigating circumstances, are not apparent from this record (see discussion under next point). Defendants presented no proposed findings of fact on the absence of pecuniary injury to the statutory beneficiaries; nor did they discuss the issue in their memorandum to the trial court on damages. The matter being presented for the first time on appeal, we do not consider it. See § 21–2–1(20), N.M.S.A.1953 (Repl. Vol. 4).

Finally, defendants conclude that the verdict is excessive by comparing it with other New Mexico verdicts. As we have said, this verdict is supported by substantial evidence. Even assuming comparison of verdicts is a proper method of determining excessiveness, we refer defendants to Annot., 49 A.L.R.3d 934 (1973).

*(5) Mitigating circumstances.*

█ The defendant complains that the trial judge did not consider the following mitigating circumstances: the failure of the brakes; the conduct of the decedent;

and, the conduct of decedent's parents. As we stated earlier, there is substantial evidence in the record which indicates that the brakes did not fail and that the decedent acted with due regard toward his own safety. The alleged misconduct of the parents, if it existed, was so remote to the accident itself that the trial judge was justified in ignoring it.

### (6) Loss of society.

 Plaintiff would have us sustain the $10,000.00 awarded by the trial court for loss of decedent's society, companionship, care and protection. In so contending, plaintiff recognizes Cerrillos C. R. R. Co. v. Deserant, 9 N.M. 49, 49 P. 807 (1897), overruled in part in Stang v. Hertz Corp., 81 N.M. 348, 467 P.2d 14 (1970). The court in *Cerrillos* stated:

> "\* \* \* Such a rule must be that, from the proof as to age, earning capacity, health, habits, and probable duration of life, the jury shall say what is the present worth of the life of deceased, *with nothing to be added by way of consolation to the parties* or party entitled as distributees to the proceeds of recovery, and nothing for suffering or anguish of mind or body by the deceased. It is resolved into a cold question of dollars, with sentiment in no way to be taken into account. \* \* \*" [Emphasis added]

It is true, as plaintiff argues, that this statement has been considerably eroded. See Stang v. Hertz, supra. However, the statement forbidding a recovery of the type involved here has never been overruled. Therefore, we are bound by the holding in *Cerrillos* that loss of society is not an element of damages for wrongful death. Alexander v. Delgado, 84 N.M. 717, 507 P.2d 778 (1973).

We affirm the judgment in respect to liability. We affirm the judgment of $57,000.00 for the loss of the child. We reverse the award of $10,000.00 for the loss of the society of the child.

It is so ordered.

SUTIN, J., concurs in part and dissents in part.

HERNANDEZ, J., specially concurs.

SUTIN, Judge (Concurring in part and dissenting in part).

I concur in the award of $57,000 for pecuniary damages awarded for the death of Gregory Lee Wilson. I dissent on the denial of $10,000 for loss of society.

### A. The Award of Pecuniary Damage

### (1) Contributory Negligence of Decedent

I desire to add to this point on the subject of statutory violation for which defendants contend.

The trial court found decedent was travelling south on Chelwood across the southernmost lanes of Menaul; that the accident occurred in the southeast quadrant; that there was no evidence of negligence on the part of decedent.

"Proximate cause" is not an issue in this case. Negligence on the part of the decedent is the issue. The trial court found that there was no evidence of negligence on the part of decedent. Contributory negligence consists of two successive issues of fact: (1) negligence of plaintiff and (2) that such negligence proximately contributed to the accident. U.J.I. 13.1. The trial court found no negligence on decedent's part. Thus, it was not necessary to decide, and the trial court did not decide, the second issue. The issue of whether decedent's negligence proximately contributed to the accident is not properly before this court. It would be necessary to remand this case to the trial court for a finding on that factual issue before it could be considered by this court. If we accept defendants' contention that decedent violated the pertinent statutes, the issue of proximate cause must be decided by the trial court. The trial court made no finding on proximate cause.

For lack of evidence, the trial court did not determine upon which side of Chelwood decedent travelled when decedent crossed the southernmost lanes of Menaul.

A bicyclist is in the same duty category as other vehicular traffic. Aragon v. Speelman, 83 N.M. 285, 288, 491 P.2d 173 (Ct.App.1971).

The issue is: Does the fact that the accident occurred in the southeast quadrant of the intersection evidence negligence per se of the decedent in violation of motor vehicle statutes? My answer is "No".

The trial court's finding that the accident occurred in the southeast quadrant does not bear upon negligence of the decedent.

No witness saw decedent when he initially entered the intersection. "Speculation" is the act of theorizing about a matter as to which evidence is not sufficient for certain knowledge. Pavlos v. Albuquerque National Bank, 82 N.M. 759, 487 P.2d 187 (Ct.App.1971), dissenting opinion, p. 768. Where the burden of proof is on the defendants, we cannot speculate whether decedent was on the right or wrong side at the time of crossing the Menaul intersection. Decedent could have been on the right side and travelled to the wrong side to attempt to avoid the collision. "Where there are no eyewitnesses, the love of life speaks as a silent witness against * * * contributory negligence * * *." Williams v. Town of Silver City, 84 N.M. 279, 288, 502 P.2d 304, 313 (Ct.App.1972), concurring and dissenting opinion. See Tauch v. Ferguson-Steere Motor Company, 62 N.M. 429, 438, 439, 312 P.2d 83 (1957).

Without any evidence to rebut decedent's presumption of due care, the presumption did not vanish. *Pavlos,* supra.

The burden was on defendants to prove by credible and substantial evidence that decedent was actually travelling south across the Menaul intersection on the east or wrong side thereof at the time of the accident. Defendants did not meet that burden. Hartford Fire Insurance Company v. Horne, 65 N.M. 440, 338 P.2d 1067 (1959); Committee Comment, U.J.I. 12.16. See Paddock v. Schuelke, 81 N.M. 759, 473 P.2d 373 (Ct.App.1970); Pavlos v. Albuquerque National Bank, supra.

The only physical fact which bears upon decedent's negligence is the place of impact. However, "[t]he physical facts rule may not be invoked with respect to speed, position, etc., of movable objects if the facts relating to speed, position, etc., must be established by oral evidence." Crocker v. Johnston, 43 N.M. 469, 474, 95 P.2d 214, 217 (1939). The physical facts rule is an evidentiary question. For New Mexico cases, see Bolen v. Rio Rancho Estates, Inc., 81 N.M. 307, 466 P.2d 873 (Ct.App.1970). For a critical analysis of the "Physical Facts Rule", see Hoffman, The "Physical Facts Rule": To Seem Is To Be?, 2 N.M. L.Rev. 56 (1972). The place of impact does not establish the position of decedent when travelling through the intersection on his bicycle.

The time has come for this court to recognize that a motor vehicle is a dangerous instrumentality. Hess v. Pawloski, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927); Miller v. Marsh, 53 N.M. 5, 10, 201 P.2d 341 (1948). When an automobile is operated as it was in this case, an emergency arose. In the absence of an emergency, decedent had a duty to exercise " * * * that degree of care which a reasonably careful child of the age [7 years, 10 months], mental capacity, and experience of the decedent would use under circumstances similar to those shown by the evidence." U.J.I. 12.5. In the presence of an emergency, decedent was only required to do that which seemed reasonable to him to avoid collision after discovery of the danger. *Miller,* supra.

There is substantial evidence to support the trial court's finding that decedent was not guilty of contributory negligence.

(2) *The Award Was Not Excessive.*

Defendants requested the following finding:

The mathematical formula presented by Everett Dillman is impractical and

lacking in credibility under the circumstances.

This requested finding was refused. An interesting question arises as to the admissibility of testimony on damages for death of a child by an economist and statistician whose qualifications are unimpeachable and unchallenged. This appears to be a new question in New Mexico.

The admission of expert testimony rests within the broad discretion of the trial court. City of Santa Fe v. Gonzales, 80 N.M. 401, 456 P.2d 875 (1969); Dahl v. Turner, 80 N.M. 564, 458 P.2d 816 (Ct. App.1969); 39 A.L.R.3d 207 (1971). The trial court did not abuse its discretion.

The best authority in support of Dillman's testimony is found in Volume 1971, No. 2, of The Defense Research Institute, Inc., entitled "The Economic Expert In Litigation." It contains an invaluable dissertation on the use of economists, methods of evaluating economic losses in legal proceedings, methods of meeting the challenged testimony, an alphabetical listing of the names of experts whose testimony is recorded. Listed as one of the economic consultants is Everett G. Dillman. See also, Hamilton & Patterson, The Economic Side of Wrongful Death in New Mexico, 2 N.M.L.Rev., p. 127 (1972). The D.R.I. document also contains other materials, bibliography and citation of cases. The citation closest in point to this case is Henry Grady Hotel Corporation v. Watts, 119 Ga.App. 251, 167 S.E.2d 205 (1969) where verdicts of $113,000 were upheld for the death of a 14 year old son.

The mathematical formula presented by Professor Dillman was not impractical or lacking in credibility. The trial court did not err in refusing defendants' requested finding.

An award of $57,000 for the death of a boy almost 8 years of age is not excessive. We should not hold an award excessive except in extreme cases. Baca v. Baca, 81 N.M. 734, 741, 472 P.2d 997 (Ct.App. 1970). "However, the change in the size of personal injury awards cannot be attrib-

uted solely to their (economists') testimony. We cannot ignore the fact that society is undergoing significant changes in its attitudes concerning human life." D.R.I., supra, p. 5.

A review of recent cases shows that a verdict of $1,800,000 was upheld for the death of a 15 year old son. Compania Dominicana de Aviacion v. Knapp, 251 So. 2d 18 (Fla.App.1971). An award of $252,000 was upheld for the death of an 18 year old young man. Hart v. Forchelli, 445 F.2d 1018 (2nd Cir. 1971). See, State v. Daley, 287 N.E.2d 552 (Ind.1972).

The judgment of $57,000 is not excessive.

### B. *Recovery For Loss of Society*

In 1897, in a death action, Cerrillos C. R. R. Co. v. Deserant, 9 N.M. 49, 68, 49 P. 807 (1897), held that nothing could "be added by way of consolation to the parties or party entitled as distributees to the proceeds of recovery"; that it was erroneous to instruct the jury that a mother as a nominal plaintiff could recover for loss of comforts and protection for the death of her husband and two sons.

The court said (p. 68, 49 P. p. 813):

It is resolved into a cold question of dollars, with sentiment in no way to be taken into account.

The court arrived at this harsh conclusion because it ruled that damages were recoverable only for "the present worth of the life of deceased".

This is a misreading of the Death Act. Section 22-20-3, N.M.S.A.1953 (Vol. 5) reads in part as follows:

* * * [T]*he jury in every such action may give such damages, compensatory and exemplary, as they shall deem fair and just,* (taking into consideration the pecuniary injury or injuries resulting from such death) *to the surviving party or parties entitled to the judgment* * * *. [Parenthesis and emphasis added].

This statute means that surviving parties entitled to judgment may recover compen-

satory and exemplary damages arising out of the death of kin. The jury or the fact finder only considers the pecuniary or dollar value of the injury or injuries resulting from such death. The absence of pecuniary injury "does not preclude an award of substantial damages for the death." Baca v. Baca, supra. The term "compensatory damages" covers "the full loss or detriment suffered by the injured party and makes him financially whole." Castro v. Bass, 74 N.M. 254, 258, 392 P.2d 668, 671 (1964). It includes pain and suffering, the loss of decedent's society, companionship, care and protection. "Exemplary damages" are "punitive damages", and are awarded as punishment of the offender. Galindo v. Western States Collection Company, 82 N.M. 149, 477 P.2d 325 (Ct.App.1970).

We must remember that the wrongful death act has for its purpose more than monetary compensation. It is intended, also, to promote safety of life and limb by making negligence that causes death costly to the wrongdoer. Stang v. Hertz Corporation, 81 N.M. 348, 350, 351, 467 P.2d 14 (1970). *Stang*, p. 352, 467 P.2d p. 18, disavowed the statement in *Cerrillos*, supra, "to the effect that nothing is to be included for 'suffering or anguish of mind or body by the deceased.'" The "cold question of dollars" without "sentiment" has disappeared.

The doctrine of *Cerrillos*, supra, in 1897, is not the doctine 76 years later because "[t]he public policy of one generation may not, under changed conditions, be the public policy of another." Funk v. United States, 290 U.S. 371, 381, 54 S.Ct. 212, 215, 78 L.Ed. 369, 93 A.L.R. 1136 (1933); United States v. Mitchell, 322 U.S. 65, 66, 64 S.Ct. 896, 88 L.Ed. 1140 (1944).

Recovery for loss of society, comfort and protection under pecuniary loss death statutes has reached a strong position in actual money value. It is not the privilege of the wrongdoer to hide behind the uncertainties inherent in the loss he has created. Wycko v. Gnodtke, 361 Mich. 331, 105 N. W.2d 118, 123 (1960); Smith v. City of Detroit, 388 Mich. 637, 202 N.W.2d 300 (1972); Fussner v. Andert, 261 Minn. 347, 113 N.W.2d 355, 358, 359 (1962); Wardlow v. City of Keokuk, 190 N.W.2d 439 (Iowa 1971); 19 Vand.L.Rev. 1405, 1407 (1966); 39 N.D.L.Rev. 198, 201, 202 (1963).

"* * * [T]he legal and social standards of 1846 are as dead as the coachman and his postilions who guided the coaches of its society through the dark and muddy streets * * *." *Wycko,* supra. If the Supreme Court disagrees, the Wrongful Death Statute should be amended. It was in Michigan. *Smith,* supra.

The plaintiff was entitled to recover $10,000 for loss of society, comfort and protection.

HERNANDEZ, Judge (specially concurring).

I concur in the result.

As my reasons for concurring as to the defendants' fourth point differ from those of Judge Lopez I will state my views separately.

Defendants contend that the award of $57,000.00 is excessive and that it should either be set aside or that a substantial remittitur should be granted. They argue that the trial court was overwhelmed by the speculative testimony of Professor Dillman.

I do not agree.

It must be kept in mind that "The statutes allowing damages for wrongful act or neglect causing death have for their purpose more than compensation. It is intended by them, also, to promote safety of life and limb by making negligence that causes death costly to the wrongdoer." Also, "* * * substantial damages are recoverable without proof of pecuniary loss." Stang v. Hertz Corp., 81 N.M. 348, 467 P.2d 14 (1970). And, "There is no fixed standard for measuring the value of a life, and, as in personal injury cases, wide latitude is allowed for the exercise of the judgment of the jury in fixing the

amount of such an award. An appellate court should not hold an award of damages to be excessive except in extreme cases." Baca v. Baca, 81 N.M. 734, 472 P.2d 997 (Ct.App.1970).

Evidence introduced by the plaintiff showed that the decedent was seven almost eight years old, and in good health, at the time of his death. Two of his teachers testified that he was bright, motivated and above average in school and that he had good potential as a student. Plaintiffs also introduced evidence showing that his mother was a high school graduate and had attended college one year. His father was a high school graduate and had attended college four years but had not received a degree. The father was the proprietor of a launderette and his income was about $6,200 per year. Decedent's maternal grandfather was a retired medical doctor who had practiced over thirty-eight years.

Professor Dillman, who was called as an expert witness by plaintiff, was a professor of Business Administration at the University of Texas at El Paso and a business and economic consultant. He testified that the decedent had a life expectancy of 61.43 years, and a work-life expectancy of 43.5 years beginning at age 18. The first figure he said was obtained from Vol. 12, part 3, N.M.S.A., p. 366, "Commissioners 1958 Standard Ordinary (1950–54)", and the second figure from tables published by the U. S. Department of Labor. He went on to testify since the decedent was only seven almost eight years old he consequently had no demonstrated adult earning capacity. Therefore, it was necessary to place decedent in a "statistical group" in order to be able to make assumptions as to his educational attainment, marital status, and earnings. Referring principally to figures published by the Department of Commerce, Bureau of the Census, he said they showed that the average educational attainment of males in New Mexico and Nationally was a little over 12 years and that 59.-7% of them completed high school. The gross lifetime earnings of a male high school graduate would be $371,094.00 and a single male who had 4 years of college would be $584,000.62. He also testified that statistics indicated that there was a 50% probability that decedent would have married by the age of 23 and a probability that he would have remained married 75% of the time of his remaining work-life expectancy.

The professor testified the lifetime gross earning figures, depending on whether decedent was married or single or whether he was a high school graduate and had completed 4 years of college, would have to be adjusted to arrive at the present worth of decedent's life. He said that the gross figures would have to be increased by the rate of 5% per year to allow for increases in the productivity of labor and increases in the cost of living. In support of the use of the 5% figure, he cited the increase in wages of those employed in manufacturing from $24.27 per week in 1927 to $143.73 in 1970. The resulting figure would then have to be reduced by 5% per year to compensate for the earning power of money. The 5% figure came from the rate of return on triple A tax free municipal securities. The figure was also reduced to compensate for the payment of federal and state income taxes, social security payments and maintenance or living costs. Using the same additions and deductions he testified that the present worth of decedent's life was as follows: If single and a high school graduate $160,751.00; married and a high school graduate $237,346; single with 4 years of college $208,783.00; married with 4 years of college $308,263.00.

The trial court's findings pertinent to this point were: that decedent had a life expectancy of 61.43 years and a work-life expectancy of 43.4 years; that he would have completed 4 years of high school; that he would probably have been married 75% of his work-life expectancy; and that he would probably have attended college. However, in spite of these findings the

trial court discounted even the lowest figure testified to by Professor Dillman in arriving at the award of $57,000.00.

As to the admissibility of Dr. Dillman's testimony, I believe that question was settled by our Supreme Court in Turrietta v. Wyche, 54 N.M. 5, 212 P.2d 1041 (1949):

> "No general rule can be formulated that would properly control the admission of evidence to prove a man's future earning capacity. It must be arrived at largely from probabilities; and any evidence that would fairly indicate his present earning capacity, and the probability of its increase or decrease in the future ought to be admitted * * * It may be that such testimony is speculative * * * *but no more so than any that has for its purpose the proof of future action or events.* It is all problematical at best. It is not questioned that mortality tables are admissible, but possibly not one time in fifty would the life expectancy of any individual come within a year of the actual length of his life." [Emphasis mine]

In my opinion the effect of such evidence is exactly opposite from that contended by defendants, i. e., that it is speculative and conducive to erroneous awards. I believe that the testimony of Dr. Dillman gave the trial court a reasonable basis upon which to estimate with some degree of certainty the present worth of decedent's life. To exclude evidence of this kind is to effectively exclude children from our wrongful death statute. The results of such exclusion can be seen in the judgments from States where such evidence is excluded, token awards which are neither compensatory nor punitive.

As to the question of excessiveness it is my opinion that an award should not be set aside or a remittitur ordered unless it is so grossly excessive as to carry its own obvious proof of prejudice or mistake. Considering the various sums testified to by Dr. Dillman the award of $57,000.00 is neither excessive nor mistaken.